We turn now to KBC Asset Management, NV v. Metlife, et al. 21-291. Mr. Douglas Willens will begin. Good afternoon. May it please the court. My name is Doug Willens. I represent the lead plaintiffs in this matter to institutional investors who brought this securities fraud action against Metlife, a company that for our purposes operates a pension risk transfer business whereby they assume the responsibilities for administering an employer's pension obligations. This action itself involves what we believe is a particularly egregious practice regarding the nonpayment of what we call PRT benefits. Metlife would send PR benefits to form letters by U.S. mail, one at age 65, the other at age 70 and a half, informing them of their benefits. If Metlife received no response to those letters, they would presume the annuitant was dead, pay no benefits, and release the reserves into their earnings, thereby boosting their earnings by the amount of the release. No other attempts were made to contact the PRT annuitants or even confirm that they were dead. Now, Metlife has admitted at the end of the class period that during the class period it deprived about 13,500 annuitants of their pension benefits and increased their earnings by $510 million as a result of this two-letter practice. We submit that the court erred in dismissing the securities fraud complaint, the fourth amended complaint at the pleading stage on falsity grounds, loss causation, economic loss grounds, and see enter. Now, as to falsity, there's no dispute here that Metlife restated their financials and thereby admitted that their class period financial statements were false when made. Nonetheless, the court still found that we failed to allege falsely for those financial statements. Yes, I'm puzzled by that, Mr. Willans. I mean, I see your point that clearly the financials were not accurate. On the other hand, how were they inaccurate in a way that disadvantaged the shareholders that you represent since the accurate financial statements would have shown the company in stronger position than it actually was? Well, I think the response to that, Your Honor, is there's a $510 million hole regardless of the Japanese issue. I don't see why there's a hole. If what you are addressing is a harm that's caused by the accuracy of the P&L and you know that it's false because they had to restate it and then they didn't restate it. Are you suggesting that somehow the shareholders somehow were guided by their understanding of this particular line of business in such a way that as opposed to being guided by what the company said they made that year? Well, I think the answer to that is what they're doing is they're using the $900 million to offset the $510 million resulting in a $400 million increase. If we didn't have this PRT fraud at all, the company would have had a $900 million benefit. So there is a harm. It would have been much better for the company but for this fraud. But it wouldn't have been better from the standpoint of the shareholders because the shareholders look at the P&L and say they made X million dollars last year. That was more or less than the year before. It looks good or that's how they're making their decision about whether to invest and it turns out that that statement was false in a particular direction and the direction was it understated the profits. Now, if you're going to tell me that there are specific representations that were made somewhere about this particular line of business and those were false, then maybe there'd be damages issues or other kind of complications. But those statements could be false in a relevant way, it seems to me. But the profit statement wasn't false. It's a detriment of people who are investing in this company. I would say two things to that. We do allege other statements that were false regarding the pension reserves and internal controls that the court didn't reach on falsity grounds. They reached on Santa grounds. Give me your best one. What is the most explicit – the closest that comes to a statement that we determine when people have become deceased in a state-of-the-art way? Well, I mean I think there's several. I'd say from the other pool of false statements, there's certainly the representations regarding internal controls where they say internal controls were effective throughout the class period. We allege that they were not, and they admitted at the end of the class period they were not because – and again, you can't divorce what they said in December of 2017 and January of 2018 where they specifically revealed that there were problems with this PRT fraud. And that's where the court sort of pivoted over to the loss causation economic loss. The restatement here proves the – proves that the statements were false. I disagree with you, Your Honor, on the – there's a misstatement of earnings here. There's a $500 million misstatement of earnings regardless of how you slice it irrespective of the Japanese issue. Counselor, before you run out of time, could you address Sienter? Yes. What is the evidence of Sienter? I would just say we have three main arguments on Sienter. One, that the court didn't even consider our allegations under a recklessness standard. Two, that they – that the court did not consider allegations collectively or holistically as Telobs directs, and instead he made very adverse inferences on isolated facts, which this court, as recently as in the Tal education case, said you can't do. And I think the third issue is that with respect to the internal control report, the court considered a document that was internal to MetLife that we had no access to and used that document as opposed to the document we actually relied on, the September report. The court relied on the June report to say that we had no – the issue was different, and the court considered this report. And that report was unavailable to you? Yes. Both the September report and the June report were not available to us. We relied on allegations in the Delaware Chancery Court that discussed the September report, and they came back and responded to that and said, well, look, here's the June report that says virtually the same thing. We said, well, you can't do that. We had no access to that June report. And in fact, what happened in between the June report and the September report was the court established this pilot program. And the pilot program is one of the indicia of SIENTA that we rely on, that they were studying the issue of whether a more fulsome communications procedures would help them locate unresponsive annuitants. But they knew from the 2012 settlement agreement in the multistate investigation that those procedures worked because they agreed to them as part of that settlement. So when they turn around a couple years later when, unsurprisingly, some beneficiaries say we're not receiving our benefits, they don't remedy the problem. They don't stop the practice. They say, well, we're going to study it. And it's self-evident that I would think that when you say that we're going to study whether enhanced communication procedures would be effective, that they would be effective. And we know they're effective because they already agreed to it in the context of the 2012 settlement agreement. Thank you, Mr. Ward, very much. Thank you. And we'll turn now to Ms. O'Connor for the defendants. Good afternoon, Your Honors. May it please the court. Can I be heard properly? Yes. Okay, thank you. Maeve O'Connor for the defendants' appellees. This case is based on a very unusual set of circumstances. Two reserve adjustments, each fairly large, covering the same time period and discovered at the same time but pointing in opposite directions and disclosed in the same 10-K. And, of course, the backdrop of this case, what we call the group annuities issue, was not MetLife's finest hour, as its then-CO said, and the company did express deep regret, but the lower court correctly concluded that those events don't give rise to a claim for securities fraud. And to go back to basics for just a moment, a misstatement occurs when there's a difference between a company's reported financials and its actual financials. So the plaintiffs allege in the complaint that MetLife materially misstated its financials by understating its reserves for these group annuity pension risk transfer deals and thereby overstating its profits. So to allege falsity, plaintiffs have to allege that MetLife's reported profits in the class period financials were greater than its actual profits. But what MetLife actually disclosed in the 10-K was that its reported profits were less than its actual profits due to the combined effect of the group annuities issue and the Japanese annuities issue. And for that reason, the district court correctly concluded plaintiffs have failed to allege facts supporting their theory of falsity. Now, plaintiffs' argument to the contrary is based on a couple of misapprehensions. First, they argue in effect that the court should really focus on the company's disclosures in December and January when the company said that it had an expectation that it was going to need to take a reserve charge. But viewing those in isolation doesn't make any sense because the expectation of a reserve charge was not realized as disclosed in the form 10-K. And so that's sort of what amount to plaintiffs trying to state a claim by comparing reported financials to hypothetical actual financials in a world in which the Japanese annuities issue didn't exist. And of course, that's not how the securities laws operate. And we think it's useful to just consider for a moment whether there was only one announcement date, and that being the 10-K in March of 2018. And we feel quite certain that in that circumstance, we wouldn't be here because the company would have said, gee, these two issues happened. And as a result, we actually understated our profits and overstated our reserves. So the fact of these pre-announcements should not change that. Second, the plaintiffs argue that the Japanese annuities issue was opposed. I have a little trouble following the Japanese issues question because if the information had been accurate with respect to these PRTs, why wouldn't the picture have been different? In other words, it would have been different. And why wouldn't that have made a difference, arguably? It's hard for me to understand why there isn't at least an arguable falsity claim here just because there was another one that happened to offset. I think it has to do with the nature of the claims being made, Your Honor, that plaintiffs are alleging that MetLife at the top level overstated its profits because it understated its reserves. And it's just speaking at the sort of holding corporation level. There's no specific line item disclosure that plaintiffs point to or identify with respect to the group annuities issue at all. So to the extent their theory is this company overstated its profits, that's simply not correct. The company understated its profits. And of course, when you put in the effect of the two restatements, those are real. The financials for the class period were restated and they look different. And they show that the company had an understatement of profit rather than the reverse, which is what the plaintiffs are focused on. And, you know, I think our view is that the fact that the Japanese annuities issue came to light after the group annuities issue really is not relevant. This notion that it's a sort of a post hoc effort to cover a loss doesn't really have any relevance or make sense. What matters is that both issues apply to the class period financials. Ms. O'Connor, while you're on that very question, correct me if I'm wrong. Your position is that as long as one accounting misstatement offsets another accounting misstatement, there can be no falsity, right? I think that's actually an oversimplification of my position, because my position also looks at what are the plaintiffs alleging here? So the plaintiffs are making allegations that the company's profits were overstated during the class period and the company had to restate those financials. And in fact, that's not true. The profits were understated. The plaintiffs aren't alleging within the financials on page 27, there's a disclosure that I relied on about this other issue. So I think the concept of offset is not really, you know, the issue here is that you just look at the impact of those two issues on the company's actual profits. So do I have this right, Ms. O'Connor? What you're saying is it depends on what is alleged to have been false. In other words, if there was a statement that said we relied on a false statement about the way the PRT business was conducted, because we understood this to be an important part of the business or whatever, and we were following that. And we looked at what they said they were doing, and it's false. Then perhaps the fact that there was some other offsetting mistake in the opposite direction wouldn't necessarily matter, because there would be an allegation that we relied on this false statement about how much they were reserving in this particular line of business. But it's because what they're saying is the profits were overstated, that they're wrong, because the profits, in fact, were understated. Do I have that right? Or am I oversimplifying? No, I think for purposes of this lawsuit, that's correct. And that's why this is a very – I think plaintiffs have a lot of policy arguments. This would be outrageous. But companies don't pull a Japanese annuities issue out of a hat here. This is just what happened. And when these things happened, MetLife's profits had been understated during the class period. And that is the opposite of what plaintiffs allege, and it is inconsistent with their theory. And so they have failed to allege falsity as to the reserves, which is the allegation they're trying to make, as to the reserves impacting the profits. Let me go to this standard that you seem to be advocating, perhaps retracing some of these issues. I have the sense that you're saying that nothing short of a smoking gun, that is a document that states let's commit fraud, would suffice. Is that right? No, certainly not, Your Honor. I mean, we understand. All right. So that's not your position. Well, tell me what is a realistic example of an allegation that, in your opinion, would be enough to plausibly allege CM2? On this circumstance? I think you would – I'm not sure. I think you would need to – Perhaps any other – you could use either this example or this case or any other case. Well, you frequently, in cases like this, have confidential witnesses, Your Honor, and it's not uncommon for plaintiffs to need the assistance of confidential witnesses to get over the very high pleading bar of the PSLRA and the overall case law on 10b claims. So that's a very common way for plaintiffs to cut through it. Then they have access to a confidential witness or to documents they've received in some manner through FOIA or otherwise, and they have a way of making more particularized allegations. But I think the issue in this case is simply that they just don't – holistically or individually – they don't have any allegations. Well, Ms. O'Connor, let me try to give you an example and see what you think about it. Assume for the moment that Mr. Willans could identify – I'm not sure that he did – could identify some specific statement made in public by MetLife about how wonderfully they handled finding dead people. So let's assume that he could find that. Why wouldn't it be sufficient evidence of scienter that in 2012 the company made a settlement with respect to other lines of business where it did the exact same thing that it was doing in the PRT line of business, and it got sued by state regulators all over the place and entered a settlement in which it agreed to do a completely different and better way of finding out who was dead. And it specifically carved out the PRT business for some reason that maybe you'll have an answer for me as to why that happened, other than just that wasn't what the regulators were interested in at the time. It specifically carved that out and then proceeded to keep doing the same thing that they'd been sued for and agreed to stop doing. They kept doing it in the PRT line of business and then, let's say, made a specific statement somehow that we're doing state-of-the-art death tracing in our PRT business. Now, why wouldn't you say that if that was a false statement, it was either intentionally so or at a minimum that the people who must have understood what they did when they entered this settlement recklessly disregarded, knew that there was a good chance that they shouldn't be doing this in the PRT line of business, and they went ahead and did it anyway. Why wouldn't that be good enough to prove Scienta if there is somewhere in here something the plaintiffs can point to and say that was a false statement about this specific program? If I may, Your Honor, I'd like to unpack a few pieces of that because the 2012 regulatory settlement was about use of the Social Security death master file to see whether any people had died who had a life insurance policy, such that the company could go look and see if their beneficiaries exist and try to find them. It was about how people died who are entitled to a life insurance benefit. People died differently when they're entitled to an annuity from their employer that MetLife has assumed the liability for? Well, the annuity is a life-contingent benefit. It's just a different issue. It's a different line of business, and it's a different issue. But isn't the thing that you're doing for each purpose may have different financial effects and different victims if you do it wrongly. But each time you're trying to figure out, are these people that we might owe money to or whose heirs we might owe money to dead or alive? Well, in one instance, though, Your Honor, it was there's a new technology. We're going to use it. We're going to require life insurance companies to use this death master file to figure out if people have died who haven't made a claim, and we're going to go do that. This wasn't about the death master file. This is a different thing. This is kind of recognizing that this is about whether you can stop paying people because they're dead. Because they because they haven't because they haven't responded or they could have passed away before becoming entitled. Look at the same technology that you just said was a better way of tracing who's alive and who's dead. When the question is, should we be looking for heirs to pay out life insurance benefits, too? So, look, Your Honor, this this is a this is an argument the plaintiffs have made. It's been rejected by two courts already because I'm asking you why we should reject it, because it sounds to me like if they were making some statement that says we're doing great things about figuring out who's dead and who's not dead. It seems to me hard to understand why they didn't know that they weren't doing it the best way. Well, I guess I have a few reactions to that, Your Honor. And one is that, first of all, different issue. Second of all, it's not they're trying to link an operational question. But the issue here, there was a this regulatory settlement agreement was not testing the process that was used in the group annuity business because that process wasn't used in any other. It wasn't used in the life insurance business. So it wasn't a test of is that enough? And does the company have a reserve? Does that company have enough information to release reserves? If not, is there a material issue? It wasn't a test of that at all. It was a completely different line of business. You have to understand a very large company with different operations and different types of of business lines. So there's no there's no process in the life insurance context where you send two letters to someone and then presume that they're dead and then automatically pay them. I mean, it just was a completely different business. So one is not a test of the other. One is not an indictment of the other there. You know, there's nothing when you wouldn't be sending a letter to someone you believe was dead. You wouldn't be sending a letter to someone you believe when you believe that was dead in the life insurance area, you wouldn't be sending letters to people. Are you dead? I mean, I hear what you're saying. Right. What I'm saying is I agree. It's different. Yes, it's different. It's different. And so one is not not doesn't speak to the other. There's no indictment of the other. The plaintiffs try to draw a line between them. And I think there's nothing in the record as to why the PRT business was carved out. But I will say that when regulators and a company carve something out after a lengthy investigation and those regulators never came back. I mean, those who looked at the PRT business were entirely different. It's hard to say that there was something nefarious. I mean, regulators agreed to do this and the inference plaintiffs are trying to draw seems very kind of fanciful. All right. Thank you, Mr. Thank you very much. Just make some time. We appreciate your use of it. Thank you very much. From Mr. Williams, who's reserved three minutes. Thank you, Your Honors. I, Judge Cabreras, I think you hit the nail on the head with respect to our arguments on the falsity of the financial statement. With our cases about this, at least with respect to the state, the false financial statements that our argument is that they misstated their earnings. And if you have to look at the timeline of events that happened here, you know, in the first disclosure in December of 2017 was a disclosure that, hey, we've got some problems with our PRT business. We're going to have to strengthen our reserves. Stock drops. There's no mention of the Japanese annuities issue then because it didn't exist as far as anyone knew that. Then in January of 2018, which is the end of the class parade statement, the company came out and again, only with respect to PRT says we've got a very serious internal control deficiency here regarding this two letter program. And oh, by the way, we're going to have to take a charge of reserves up from 525 to 575 million dollars. Again, no mention of the PRT issue at that point. That's where our class parade ends. It's with statements regarding the PRT business. Are you saying that those press releases were false? No, what we're saying, those are our loss causation events that led the market to believe. I mean, what the court did here. Well, suppose the next day after your defined class period, they went back and re-evaluated what they were saying about the PRT business and said, you know what? Actually, we were okay. We did this right. And then they issued an announcement of that and said, we're not going to restate our earnings. Would you have a case then? Well, I think it would depend on yes. The answer is yes. It would depend on how much from, I guess, a loss causation economic loss standpoint, whatever the stock dropped after the announcement of the bad news. Now, whether they came back and they said, well, we have no problem here. I think that raises a whole host of questions. Assuming that it was true, that they had no problem, that the money was there all along and it was a false alarm. Well, I guess that would reach other questions of Sienter and whether if it was just a mistake of mismanagement and they made a fault. I mean, that's hard to answer in the abstract because we know that's not what happened here. What happened here is they admitted there was a problem, not until several months later did they – and they've never said that PRT was handled properly. No, of course not. Of course not. But they did – I mean, let's assume hypothetically that the offset was exact for some miraculous reason. So they didn't actually even have to restate their earnings in either direction. But we discovered this other thing and it's true. You're not contending that the Japanese thing didn't happen, I take it. No. So it exactly winds up that they had precisely accurately stated their P&L. And so sorry folks for the false alarm, but it turns out we don't have to restate after all. Well, but it would still be a $500 million problem in our favor, but there's still a misstatement as to $510 million. But where does that show up? Where does that show up if there's no line item about that? And the actual profit turns out to be exactly right. They tried their best to do a fraud. It wouldn't be right. It would be off by $510 million. Why? It would be exactly the same thing that they restated. It wouldn't be off by $510 million. But they would have been $510 million better if but for the fraud. No, they wouldn't have been $500 million. Yes, because it turns out it turns out that they were exactly right. But then you're better. There's no the but in the real world, the profit statement was correct. But as Judge Cabrera has pointed out in his question earlier, it's an offset. And I mean, I'll just point the court. I mean, that's not a falsity issue, then that may be a materiality issue. But what Litwin said, the Litwin case that we cite in our brief says you can't aggregate one against the other because it incentivizes companies. It incentivizes companies to withhold positive information that they could use to negate negative information. Maybe we said that, but I have trouble understanding it. A company would say we made $100 million last year. That's a pretty good result for us. But we're going to lie about it and say we only made $50 million. We're going to be incentivized to do that and have people wonder whether we're really managing the company so well because we can save that. And if we actually turn out to be doing a fraud somewhere else, we can use that to offset it. I think if you look at Litwin on page 719, that is what they say. But I think, again, you have to look at the timeline of events here because when the stock dropped, no investor knew about the Japanese annuities issue. So there was loss causation and economic loss for investors at that point in time, regardless of what happened a month later. And that's our point and where we have a factual issue with the judges. He said, well, you haven't alleged a stock drop associated with the restatement. Well, that was not part of our case for loss causation purposes. And in fact, there was a stock drop. Now, I'm not an expert. I can't tell you today if that stock drop was statistically significant. But as the master of our complaint, we allege that the class parade ends when they made an announcement. The restatement said nothing new about our particular fraud with respect to the PRT. Thank you. Thank you for the extra time. Unless anyone has additional questions, I rest on our papers. Thank you very much.  Thank you also to Ms. O'Connor. And we will reserve decision in this case as in the others. And we are adjourned. Thank you. Our sense adjourned. Thank you. Thank you. Thank you. Thank you.